PEOPLE *v.* McELHENY.

1. PERJURY—MATERIALITY OF STATEMENTS TO ISSUES.

In a prosecution for perjury based upon defendant's testimony in a civil action denying the making of a contract to divide the profits on the construction of a certain drain, an amendment to the bill of particulars setting up an agreement whereby defendant was to pay $6,000 in settlement of said claim did not render immaterial defendant's testimony denying said contract, since he denied both the making of the contract and the settlement.

2. SAME—PROOF—CORROBORATION—QUESTION FOR JURY.

The testimony of the plaintiff in the civil action to the making of the contract, supported by the testimony of

his wife, together with the contents of certain letters written by defendant, *held*, sufficient to carry the case to the jury.

3. SAME—TRIAL—CONDUCT OF COURT.

Where defendant had given testimony which tended to show that the prosecuting attorney had, prior to the issuance of the warrant, threatened to make an improper use of criminal process for the purpose of collecting the judgment in the civil action, statements by the trial judge cautioning him to be careful what he said and which naturally would, and probably did, influence the jury against him, *held*, erroneous.

4. SAME—INSTRUCTIONS.

Where the jury returned to the court room for further instructions upon a certain point, the charge of the court given in response thereto, which not only failed to give the jury the exact information required but had a tendency to confuse and mislead them, *held*, erroneous.

Exceptions before judgment from Van Buren; Des Voignes, J. Submitted April 17, 1919. (Docket No. 112.) Decided May 29, 1919.

Clarence J. McElheny was convicted of perjury. Reversed.

*W. J. Barnard*, for appellant.

*H. H. Adams*, Prosecuting Attorney, for the people.

Respondent stands convicted of the crime of perjury. It appears that sometime in the year 1914 one Charles H. Showers as plaintiff brought suit in assumpsit against the respondent, McElheny, claiming damages, according to his bill of particulars, in the sum of upwards of $14,000. One item of the plaintiff's demand under the amended bill of particulars was as follows:

"To amount agreed to be paid by the defendant to the plaintiff at the conclusion and winding up of an arrangement which they had theretofore entered into by

the terms of which plaintiff was to furnish the money
against which the defendant was to put his time to
carry on the business of constructing drains, $6,000
being the amount then agreed to be due the plaintiff
and the amount of his interest in the dredges, ma-
chinery, contracts and assets of the business includ-
ing moneys earned and moneys advanced and which
sum the defendant agreed to pay and the plaintiff
accept; and the defendant did take over the dredges,
machinery, assets, contracts and funds but refused
to pay said sum of money."

Respondent by his amended plea in that case denied
the making of any agreement to share with the plain-
tiff in that case the profits arising out of the Coin
and Blanchard drain and averred that if any such
arrangement was made that the same was settled be-
tween the parties in December, 1910. Upon the trial
of the issue in that case, respondent here, defendant
there, swore:

"I never had any talk and arrangement with him
about carrying on the business. I was borrowing
money of Showers. I didn't have any arrangement.
At the beginning of any of these jobs I didn't have any
further or different arrangement than what you have
stated already to the jury. I had no agreement that
I was to pay him half the profits or anything of that
sort."

On the trial of the issue in the case at bar plaintiff,
Showers, swore:

"The talk was that I should furnish the money and
he would the labor, and I would get one-half of the
profits. I furnished the money for the drain, I did.
I put in a little over $3,000."

Plaintiff's wife was sworn in this case and testified:

"He wanted Mr. Showers to put up the money and
he would put in the labor, you know, and put up the
money for the drain and I heard it different times. On
our porch we were all there and he told Mr. Showers
if he would put up the money why he thought, if he

put up the money for the Coin and Blanchard drain that there would be between eleven and twelve thousand dollars profit, which would be divided between Mr. McElheny and Mr. Showers, and he also said that he would make more money for Mr. Showers than Mr. Showers ever made in his life if he would let him have the money to put in the drain."

Defendant, sworn in his own behalf in the former case, testified:

"There was nothing said whether he would have any profits from the jobs or not; no, sir.

"*Q.* Was there anything said at any time as to the fact that he should put up the money in these jobs and you would put your time up and the profits would be divided?

"*A.* Never was anything of that kind talked.

"*Q.* You never said to him?

"*A.* No.

"*Q.* Never had such an idea in your head from any talks that you had with him, did you?

"*A.* I never had a talk of that kind with him.

"*Q.* You never contemplated that that arrangement was made?

"*A.* No, sir."

A letter was introduced from respondent to plaintiff, Showers, dated November 21, 1910, in which the following appears:

"Now, stop and reason; you put your money in and I put my work up against it. You must figure that you have to be out of the use of it. There was nothing to them other jobs any way, and how could I pay you the waterworks job? You put in 200 for 45 days and got 300. Here you put in around 2,500 and will get three for one for the use of it six months."

The foregoing constitutes practically all the testimony in the record bearing upon the question of respondent's guilt of the crime of which he was convicted. The record is not clear as to how the civil action ended except that it resulted in a settlement of some kind and apparently in the entry of a judgment

upon which later an execution was issued against respondent.

During the cross-examination of the respondent by the prosecuting attorney the following occurred:

"You came over to the jail, I think, after Mr. Beattie. Nobody called you that I saw. I was right there in the jail and you came yourself after Mr. Beattie. Beattie may have called you over. You told me if I would pay this judgment of $100 that you wouldn't sue me in this case, or wouldn't press me in this case; that you would let it go; that is what you told me. You did tell me that you and I had been friendly and that was the first of it. You never mentioned that if you issued a warrant for me that you wouldn't dismiss the case, under any circumstances; you never mentioned that. You said pay the $1,600 judgment and you wouldn't press the case. You showed me those letters there; yes, sir. There was three together. You said you had been a friend of mine and didn't want to issue a warrant for me on perjury; that I would get railroaded for it; that is what you said. Every word that I have spoken here is the truth.

"*The Court:* Now, Mr. McElheny, be careful. I am not saying you are not telling the truth, but what you are stating now creates a condition here that, if there was other parties that observed, this will put you perhaps in a bad position, therefore be very careful. I am not going to permit this matter, especially under your statement now in this case to go unnoticed. This court is going to demand of its officers exact and impartial right. I want you to understand that if an officer of this court is accused of seeking to compound a felony, this court is going to call in outside assistance, if necessary, to make the investigation, and if it is found that you have told an untruth in relation to that, as to the officer, you would know what it would do.

"*A.* Your honor—

"*The Court:* I don't care; I am cautioning you. I have said, I am not saying whether it is true or untrue. I am simply cautioning you, that you are now in a court of justice and in a court where you must be cautious in what you say, and that you may have

a full and thorough understanding of it. That is all. Now proceed with your examination."

At the close of the case for the people respondent's counsel made a motion for a directed verdict upon the following grounds:

"*First:* For the reason that the testimony introduced in this case and claimed to have been false does not constitute perjury for it was not material to the issue then being tried in the case of Showers *v.* McElheny.

"*Second:* For the reason, to constitute perjury, it must be predicated upon the testimony of two witnesses or one witness with other credible testimony corroborating the witness of equal value to one witness, and for these reasons I ask for a directed verdict in this case."

This motion was denied and the case went to the jury under voluminous instructions. After being absent for a time the jury returned and the following occurred:

"*The Court:* Gentlemen, I am speaking now to the foreman—you have a foreman? Mr. Foreman, I am informed by the sheriff that you desire to see the court relative to some portion of the charge in this case.

"*The Foreman:* Yes, sir.

"*The Court:* Now, before you ask any questions I will ask you some, a question or two. Is your difficulty one arising over a question of fact or a question of law? Is it over the evidence or over the law?

"*The Foreman:* It is over the testimony, I think— the evidence that would be, I suppose.

"*The Court:* Well, Mr. Foreman, if it is a question relative to the construction of the testimony, I can't help you. If it is a question relative to the law I might perhaps give you additional instructions, but of the facts in this case and resolving of some question on the evidence, I can't help you; that is your province alone. You think it is on the question of evidence, Mr. Foreman?

"*The Foreman:* I think so. I am sure it is. That seems to be the difficulty.

"*The Court:* How do you stand? Wait a moment before you answer. What I mean—I don't care to say—have you say whether for or against, but do you stand six to six?

"*The Foreman:* No, sir.

"*The Court:* Four to eight or three to nine? How do you stand?

"*The Foreman:* Ten to two.

"*The Court:* You may be seated, Mr. Foreman. Mr. Bullard, that is your idea of it, as stated by the foreman, it is over a question of fact, over the question of the evidence that you seem to differ, is it?

"*Mr. Bullard:* Your honor, as I understand you—

"*The Court:* (Interrupting.) No, I don't care—

"*Mr. Bullard:* Yes, sir.

"*The Court:* I have got to be pretty careful about these matters, Mr. Juror—Mr. Bullard. I simply wanted to know whether your difficulty in arriving at a verdict is over the facts testified to in the case, over the evidence.

"*Mr. Bullard:* Yes, sir.

"*The Court:* It is that, is it?

"*Mr. Bullard:* Yes, sir.

"*The Court:* It is not relative as to what the law is in a given case at all?

"*Mr. Bullard:* Yes, I think it is in a way.

"*The Court:* Well first you tell me you think it is a question of fact, just as the foreman does, Mr. Bullard, and then you think it is a question of law. You may be seated. Juror on the rear seat—I can't think of your name—Mr. Cochrane, is it your idea that the difficulty arises here is over the evidence in the case, over a question of fact?

"*Mr. Cochrane:* It seems to me a question of law, I should think.

"*The Court:* You think it is a question of law that the difficulty is about?

"*Mr. Cochrane:* It is over your instruction to the jury.

"*The Court:* If you state it is a question of law— or let me hear you state what the proposition is to me that you need further instruction on.

"*Mr. Cochrane:* I could tell—maybe I would give it wrong.

"*The Court:* Well, you are conscientious about it. State it.

"*Mr. Cochrane:* It is the question whether this settlement was made before this letter, and you stated if the settlement was made before—

"*The Court:* (Interrupting.)    After the letter.

"*Mr. Cochrane:* After this letter was written why the plaintiff would be considered under contempt.

"*The Court:* Would not be guilty of perjury.

"*Mr. Cochrane:* Yes, that is the way I interpreted.

"*The Court:* Well, now gentlemen, give me that paper.   Therefore, your question or difficulty arises from this, as to whether or not the matter testified to by the respondent in this case was material to the issue; that seems to be your trouble, does it not?

"*Mr. Cochrane:* Yes."

Then followed a repetition by the court of a large portion of his charge together with some added matter, in closing which the court said:

"That is all I care to say to you, gentlemen.   You may retire.   You are so near a verdict, ten to two, that I feel I should send you back for further deliberation.   You may now go with the officer."

Counsel excepted in the following language:

"*Mr. Barnard:* At this time I desire to take an exception to the additional instructions, for it would tend to mislead the jury, and was not an additional instruction at the point asked by the juror.   They said they wanted to know whether or not the settlement was made after or before—the claimed settlement was made, after or before the writing of the letters, and it is undisputed in this case that the settlement, if any was made, was made in December, and the last letter that was written in this case was November 21, 1910, therefore said instructions would tend to mislead the jury,"

—to which the court replied:

"*The Court:* The facts remain very carefully on this record that the jurors—the jury were interrogated in relation as to what the difficulty was.   It is clear

from the investigation of the juror that what was in his mind was whether or not—and he so replied to a question that I asked him, whether or not the trouble with them was whether the testimony was material, and it is upon that question—and I simply gave to the jury the instructions that I had given to them upon the proposition heretofore."

The jury thereupon retired and returned with a verdict of guilty.

BROOKE, J. (*after stating the facts*). The first assignment of error discussed in counsel's brief is based upon the refusal of the court to direct a verdict in favor of the respondent upon the ground that the testimony set forth in the information was not material to the issue being tried in the civil case. This contention is based upon the assertion that after the amended bill of particulars was filed the only issue between the parties was whether there had been a settlement between the plaintiff and defendant whereby the defendant had promised to pay to plaintiff the sum of $6,000 in settlement of all their differences. With this contention we cannot agree. Plaintiff in that suit asserted that a contract had been entered into for an equal division of the profits on the Coin and Blanchard drain and further by his amended bill of particulars asserted that $6,000 was the amount later agreed upon to be due the plaintiff under that contract. Respondent by his plea denied both assertions. We think, therefore, that the testimony given by respondent in the civil case in which he denied positively the making of an agreement to divide profits on the Coin and Blanchard drain was material to the issue and that the jury should have been so instructed by the court.

It is next urged by counsel that assuming the materiality of the evidence its falsity was not proven in the case at bar by "two or more witnesses or by one

witness supported by corroborating and independent circumstances." We are of opinion that the evidence of Charles H. Showers supported by that of his wife, Minnie Showers, taken together with the contents of the letters written by the respondent, was sufficient to carry the case to the jury.

Error is assigned upon the language of the court quoted in the statement of fact addressed by the court to respondent during his cross-examination. Respondent was on trial for perjury. He had given testimony which tended to show that the prosecuting attorney prior to the issuance of the warrant in the case at bar had threatened to make an improper use of criminal process for the purpose of collecting the judgment arising out of the civil case. We are not concerned with the explanation given by the prosecuting attorney of the incident in question. The point is, Were the strictures of the learned trial judge delivered to respondent on trial for an offense involving his liberty for a long term of years such as were calculated to prejudice him in the minds of the jurors who heard the remarks and later brought in a verdict of guilty? We are constrained to hold that the language indulged in by the court was such as naturally would and probably did influence the jury against the respondent to his injury. We have examined the assignments of error touching the alleged improper conduct of counsel for the people and with reference to the admission and rejection of testimony and find therein no reversible error.

There are many assignments upon the charge of the court as given and particularly upon that portion of the charge given after the jury returned to the court room for the second time. These it is unnecessary to consider at large. It is sufficient to say that we think the language of the court in the latter portion of his charge is open to the criticism that it was

likely to confuse and mislead the jury and that it failed to give to the jury the exact information required which was whether the letters introduced in evidence were dated before or after the date of the claimed settlement in December, 1910. After a consideration of the whole record we are of opinion that the respondent did not have that fair and impartial trial to which he was entitled under the law.

Judgment is reversed and a new trial ordered.

BIRD, C. J., and OSTRANDER, MOORE, STEERE, FELLOWS, STONE, and KUHN, JJ., concurred.